IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PHILLIP RAY HARKLESS, #266580,       )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          CASE NO. 2:11-CV-98-WHA
                                     )               [WO]
                                     )
KAY WILSON, *et al.*,                )
                                     )
          Defendants.                )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on claims presented by Phillip Ray

Harkless ["Harkless"], an indigent state inmate, challenging the medical treatment provided

to him for back/neck pain and the failure to provide him distilled water for operation of his

CPAP machine during his prior incarceration at the Easterling Correctional Facility

["Easterling"].  *Complaint - Doc. No. 1* at 3; *First Amendment to Complaint - Doc. No. 10*

at 1-2; *Second Amendment to Complaint - Doc. No. 12* at 1-2.  Harkless names Kay Wilson,

a registered nurse and the Health Services Administrator for Easterling, Dr. Jean Darbouze,

an attending physician, and Kristy Jolly, a licensed practical nurse employed at Easterling,

as defendants in this cause of action.  Harkless seeks declaratory relief and monetary

damages for the alleged violations of his constitutional rights.  *Complaint - Doc. No. 1* at 4;

*First Amendment to Complaint - Doc. No. 10* at 2.

The defendants filed a special report and relevant supporting evidentiary materials, including affidavits and medical records, addressing Harkless' claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to construe the aforementioned report as a motion for summary judgment.  *Order of June 17, 2011 - Doc. No. 43*.  Thus, this case is now pending on the defendants' motion for summary judgment.  Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's response, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving

---

[1] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

In civil actions filed by inmates, federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment.   In respect to the latter, our inferences must accord deference to the views of prison [medical personnel].   Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).   Consequently, to survive the defendants' properly supported motion for summary judgment, Harkless is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).   "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."   *Id.* at 249-50.   "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.   *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."   *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).   Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment.   *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v.*

*Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment . . . ."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing

5

summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, Harkless fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

## III.  DISCUSSION

### A.  Suit Against the Defendants in Their Official Capacities - Absolute Immunity

To the extent Harkless sues the defendants in their official capacities, they are immune from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### B.  Claims for Relief

Harkless complains that during a previous incarceration at Easterling medical personnel provided inadequate treatment to him for back/neck pain. *Complaint - Doc. No. 1* at 3. Specifically, Harkless asserts that the defendants failed to order an MRI of his back to determine the cause of his pain and aid in the development of an appropriate course of treatment. Harkless also asserts that the defendants acted with deliberate indifference because they refused to provide him distilled water for use in his CPAP machine in accordance with directions from the manufacturer.[2] The defendants adamantly deny they acted with deliberate indifference to Harkless' medical needs and, instead, maintain that Harkless received appropriate treatment measures with respect to his complaints.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions

---

[2] Harkless submitted an attachment to the complaint which contained instructions from HomeMed regarding the manner in which to operate a CPAP machine. *Doc. No. 1-1* at 3-4. These instructions do not mandate use of distilled water for proper operation of a CPAP machine nor do the instructions recommend use of distilled water in a CPAP machine. Instead, the instructions direct that "[i]f . . . using a humidifier with [the] CPAP equipment[,]" the user should "fill the humidifier with water (*distilled water is recommended*) to the maximum fill line." *Id*. at 3.

sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*,

429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995)

(citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish

"not merely the knowledge of a condition, but the knowledge of necessary treatment coupled

with a refusal to treat or a delay in [the acknowledged necessary] treatment."

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled.  *See Estelle v. Gamble,* 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995).  Instead, something more must be shown.  Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless.  *See Farmer v. Brennan,* 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n.28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need . .

. , Plaintiff[] must show:  (1) a serious medical need; (2) the defendants' deliberate

indifference to that need; and (3) causation between that indifference and the plaintiff's

injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  When seeking

relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.  *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere

10

> negligence or medical malpractice 'not sufficient' to constitute deliberate
> indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not
> constitute deliberate indifference).  Nor does a simple difference in medical
> opinion between the prison's medical staff and the inmate as to the latter's
> diagnosis or course of treatment support a claim of cruel and unusual
> punishment.  *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551
> F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation

and internal quotations omitted) (To show deliberate indifference to a serious medical need,

a plaintiff must demonstrate that [the] defendants' response to the need was more than

"merely accidental inadequacy, negligence in diagnosis or treatment, or even medical

malpractice actionable under state law.").  Moreover, "as *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques or forms of

treatment 'is a classic example of a matter for medical judgment' and therefore not an

appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at

1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as

to how a condition should be treated does not give rise to a constitutional violation."); *Hamm*

*v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different

mode of medical treatment does not amount to deliberate indifference violative of the

Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical

personnel do not violate the Eighth Amendment simply because their opinions concerning

medical treatment conflict with that of the inmate-patient).  Self-serving statements by a

plaintiff do not create a question of fact in the face of contradictory, contemporaneously

created medical records.  *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

The affidavits filed by the defendants address the allegations made by Harkless.  A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with the treatment provided to Harkless regarding the instant claims of deliberate indifference.  Dr. Darbouze provides the following detailed explanation of the treatment afforded Harkless.

> Mr. Harkless was originally incarcerated within the Alabama Department of Corrections ("ADOC") system beginning in August of 2009. Prior to his incarceration within the ADOC system, Mr. Harkless did have a history of lumbar disc surgery and discomfort.  Mr. Harkless reported that, in approximately 1996, he experienced a rupture of two discs in his back in the L3-4 region of his lower spine which resulted in a surgical procedure to repair this condition.  It is evident from Mr. Harkless's medical records that he indicated to members of the medical staff at Kilby Correctional Facility that a physician in Tuskegee, Alabama had previously provided medical treatment relative to his back pain.  However, the medical staff at Kilby never received any response to [a] previous request for medical records related to Mr. Harkless's prior back condition and this prior provider apparently does not have any records responsive to this request.
>
> At the outset of his incarceration [in 2009], Mr. Harkless was transferred among a number of different correctional facilities prior to his arrival at Easterling on July 6, 2010.
>
> Mr. Harkless began complaining of lower back pain within one month of his incarceration within the ADOC system, i.e. at least 8 months prior to his incarceration at Easterling.  In November, 2009 (prior to his incarceration at Easterling), Mr. Harkless attended sick call at another facility and complained of lower back pain, even going so far as demanding back surgery.  Mr. Harkless was evaluated by a member of the medical staff at [Draper Correctional Facility] on November 23, 2009, at which time he was provided with certain exercises to help assist with any discomfort associated with his back.

Immediately prior to his departure from [Draper], Mr. Harkless submitted a sick call request form dated December 2, 2009, in which he complained of pain in his lower back, left leg and both feet and requested the opportunity to be evaluated by a specialist. Mr. Harkless was evaluated by the [attending] medical staff . . . on December 7, 2009, at which time he informed them that he had previously undergone surgery on his back in 1996 as a result of a car accident. As indicated through the evaluation by the medical staff at this other facility, Mr. Harkless did not demonstrate any swelling, any limitations on his ability to walk or any other range of motion issues.

When a physician at St. Clair Correctional Facility evaluated Mr. Harkless on January 25, 2010 [a few months prior to his transfer to Easterling], he continued to complain of lower back pain especially during periods of prolonged standing. After a thorough evaluation by the physician at St. Clair, it was determined that there was no physical manifestations of any issues relative to Mr. Harkless's complaints of back pain and he was provided with the non-steroidal anti-inflammatory medication, Naproxen, also known as Naprosin.

Mr. Harkless's complaints related to lower back pain continued into the spring and early summer of 2010. Prior to his arrival at Easterling, Mr. Harkless had, in fact, undergone x-rays of his lower back in response to his complaints of lower back pain. The results of the x-rays of his lower spine dated March 22, 2010 were "normal."

When Mr. Harkless was evaluated by a physician at Staton Correctional Facility on March 30, 2010, related to his lower back pain, the physician did not order any MRI testing with respect to Mr. Harkless's lower back but did prescribe pain medication and anti-inflammatory medication. Moreover, additional x-rays of Mr. Harkless's lumbar spine on April 5, 2010, were also "normal." Prior to April 20, 2010, Mr. Harkless had not mentioned any requests for an MRI of his lower back.

On April 20, 2010, Mr. Harkless claimed that he had been scheduled to undergo an MRI of his back prior to his departure from Staton Correctional Facility. A review of Mr. Harkless's medical records indicated that there was no order or any findings or directives for Mr. Harkless to udnergo an MRI of his lower back. Between April 28, 2010, and June 18, 2010, Mr. Harkless was seen at least four (4) times relative to his request for an MRI of his back, though no clinician during this period of time at the various facilities where Mr. Harkless was incarcerated ever ordered an MRI.

Mr. Harkless arrived at Easterling on July 6, 2010. The day after Mr. Harkless arrived at Easterling, I entered orders allowing Mr. Harkless to utilize

a lumbar brace (which had been provided to him at another facility), and also entered orders allowing him to avoid periods of prolonged standing or heavy lifting in his day-to-day activities at Easterling, which were consistent with the orders entered by the medical staffs at the facilities where he had previously been incarcerated.

On August 2, 2010, Mr. Harkless submitted a sick call request form requesting inserts for his shoes as well as an additional set of shoes because of pain he was experiencing in his back when he walked for periods of time. Mr. Harkless was evaluated during sick call conducted by the Easterling medical staff on August 2, 2010, at which time the medical staff discussed with Mr. Harkless the types of things that he could do in terms of his day-to-day activities to alleviate any pain or discomfort in his back. The sick call nurse also notified Mr. Harkless that she would order a pack of insoles for his use. Mr. Harkless received a new pack of insoles for his shoes three (3) days later, i.e. on August 5, 2010.

Mr. Harkless was next evaluated during sick call on August 20, 2010, at which time he complained again of lower back pain and requested pain medications. During sick call on August 20, 2010, Mr. Harkless did not demonstrate any weakness, altered gait, limitations in his range of motion, numbness or swelling, so the medical staff informed him to notify them if his condition worsened or changed in any way and [Harkless] was notified that he would be undergoing x-rays of his lower back. Based upon this evaluation, Mr. Harkless's complaints appeared to be entirely muscular in nature. Nevertheless, Mr. Harkless was scheduled for an appointment with me related to his complaints of back pain.

While awaiting an appointment with me, Mr. Harkless underwent an annual physical on August 24, 2010. During this annual physical, Mr. Harkless mentioned complaints related to his sinuses but did not mention any issues of any kind relative to his back or lower back pain

I evaluated Mr. Harkless on September 2, 2010, at approximately 8:00 a.m. At that time, he complained of lower back pain and I conducted a thorough physical examination which did not indicate any specific cause for his low[er] back pain other than on-going minor, non-acute arthritic conditions which were likely the result of his prior back condition coupled with his overall physical condition and age. Out of an abundance of caution, I directed Mr. Harkless to undergo x-rays of his lower back. X-rays obtained of Mr. Harless's lower spine on September 3, 2010, only revealed minor degenerative joint disease in his lower spine. As indicated in the radiologist's notes, there was no deformity or other acute condition discovered through the x-ray, which

required further treatment.  Furthermore, if the x-rays had revealed any conditions of any concern requiring further imaging studies, such findings would have been included in the radiologist's findings and recommendations.

Mr. Harkless acknowledged in a sick call request form dated [for] September 15, 2010, [that] he had undergone x-rays of his back following his last sick call evaluation.  Mr. Harkless submitted a sick call request form dated September 16, 2010, complaining of continuing back discomfort.  He was evaluated during sick call on September 16, 2010, when he mentioned these same complaints.  Mr. Harkless was referred to me for further evaluation of his complaints.  I entered orders for Mr. Harkless to undergo another set of x-rays of his lower spine on September 21, 2010.  These additional x-rays were taken on September 24, 2010, which were also normal in all respects.  Based upon my review of the radiologist's notes, it was apparent at that time that Mr. Harkless's complaints of back pain remained muscular in origin and that no further diagnostic testing was necessary without some indication of some significant deformity or other underlying back condition, which were notably absent from the radiologist's findings.

Mr. Harkless next submitted a sick call request form on September 29, 2010, requesting the opportunity to see an ENT specialist related to his breathing and/or sinus discomfort.  The medical staff evaluated Mr. Harkless on [this same date with respect] to his complaints of sinus discomfort and he was referred to me for evaluation on October 4, 2010.  It is important to note that x-rays taken of Mr. Harkless's sinuses prior to his incarceration at Easterling (i.e. on January 11, 2010) were normal in all respsects.

When I evaluated Mr. Harkless on October 4, 2010, he complained of chronic nasal congestion and other sinus related problems for which I prescribed him medication and referred him for evaluation of potential enlarged tonsils.  The medical staff subsequently obtained an appointment for Mr. Harkless with an off-site ENT specialist on October 27, 2010.

In a sick call request form dated October 13, 2010, Mr. Harkless requested "another back (belt) brace" because the back brace he had received "will not stay on me."  The medical staff evaluated Mr. Harkless on October 13, 2010, at which time the medical staff discussed with him the issues relative to his back brace and attempted to assist him in using the back brace as it was intended.

Mr. Harkless submitted another sick call request form dated October 21, 2010, in which he continued to complain of back discomfort and requested an MRI and consultation with a "surgeon."  The medical staff evaluated Mr. Harkless on October 21, 2010, at which time the medical staff noted that he

had complaints of numbness and weakness and limitations in his range of motion but there was no apparent swelling in his back. Given Mr. Harkless's description of his back pain and the absence of any clear signs of any significant skeletal or other significant issue, the medical staff continued to counsel [Harkless] in ways to avoid the day-to-day activities which were apparently causing discomfort.

On October 22, 2010, the medical staff at Easterling was notified that Mr. Harkless's appointment with an off-site ENT specialist was canceled due to a conflict with the ENT specialist's appointment schedule. Because of the cancellation of the original appointment with the off-site ENT specialist, the medical staff obtained the next available appointment date for Mr. Harkless with the ENT specialist, which was December 14, 2010.

Mr. Harkless next submitted a sick call request form dated November 10, 2010, complaining of back pain. That same day, Mr. Harkless was evaluated during sick call, which confirmed the absence of any marked change in his condition or the nature of his complaints, and he received orders for acetaminophen.

In a sick call request form dated November 13, 2010, Mr. Harkless complained of sinus and throat discomfort. However, when Mr. Harkless reported to sick call, he reported cold-like symptoms and headaches and received medication for these symptoms. Mr. Harkless then requested a renewal of his profiles in a sick call request form dated December 3, 2010. As indicated on Mr. Harkless's December 3, 2010, sick call request form, the requested profiles were renewed.

Mr. Harkless attended the appointment with the off-site ENT specialist on December 14, 2010. As indicated from the notes from Mr. Harkless's December 14, 2010, appointment with the ENT specialist, the ENT specialist diagnosed Mr. Harkless as experiencing chronic congestion and sinusitis which should initially be treated with a stronger dose of antibiotics. Following this December 14, 2010, appointment, we immediately entered orders consistent with the recommendations of the off-site ENT specialist.

In a sick call request form dated January 13, 2011, Mr. Harkless again requested the opportunity to see a specialist regarding his back as well as the opportunity to undergo an MRI for his continuing back discomfort. That same day, Mr. Harkless underwent an evaluation by a registered nurse at Easterling who confirmed that Mr. Harkless was not demonstrating any limitation in his range of motion and did not indicate any numbness or swelling at the time of the evaluation. In short, Mr. Harkless did not exhibit any change or alteration of his condition.

Mr. Harkless attended a follow-up appointment with the ENT specialist on January 18, 2010.  As indicated from the notes from the consultation with the ENT specialist, Mr. Harkless underwent an endoscopy which was negative for any particular chronic condition which required treatment and the ENT specialist also confirmed that Mr. Harkless's tonsils were not causing any significant isuses.  The off-site ENT specialist recommended that we treat Mr. Harkless's chronic sinusitis with additional medication in the form of a nasal spray and that we further watch his sinuses for significant bleeding.  Following the January 18, 2011, evaluation by the ENT specialist, we entered orders consistent with the recommendations of the ENT specialist.

In a sick call request form dated February 27, 2011, Mr. Harkless again requested an MRI for his complaints of continuing back pain.  An evaluation by the medical staff during sick call on February 27, 2011, revealed that Mr. Harkless still did not demonstrate any limitations in his range of motion or swelling of any kind, though he did report weakness and numbness as a result of back discomfort.  Again, the examination did not reveal any change in the nature of his complaints . . . with respect to his back.

Mr. Harkless attended his final appointment with the ENT specialist on March 1, 2011, at which time the off-site ENT specialist recommended certain adjustments for Mr. Harkless's C-Pap machine and indicated that there would be no need for any [additional] follow-up visit.

Mr. Harkless first complained of neck discomfort in a sick call request form dated March 19, 2011.  The medical staff evaluated Mr. Harkless's neck pain on March 19, 2011, at approximately 5:40 p.m. at which [time] he was referred to me for further evaluation.  Mr. Harkless then requested another appointment with the ENT specialist on March 26, 2011.  When Mr. Harkless was summoned to sick call on March 26, 2011, he signed a waiver acknowledging a pending appointment with me on March 29, 2011.

In a sick call request form dated April 14, 2011, Mr. Harkless again requested an MRI of his back, treatment for his back and an opportunity to see a "specialist" related to his nose and throat.  Upon evaluation during sick call on April 14, 2011, Mr. Harkless exhibited a normal range of motion and did not demonstrate any swelling of any kind in his back.  Mr. Harkless continued to complain of weakness and numbness related to his back.  Following this sick call evaluation, Mr. Harkless was referred for [additional] evaluation by me.

I evaluated Mr. Harkless regarding his continuing complaints of back pain on April 25, 2011, at which time I did not note any objective physical manifestations for which Mr. Harkless required evaluation by any type of off-

site specialist. In short, his complaints and his condition had not changed at all since my last evaluation. During the course of this April 25, 2011, appointment, I also evaluated Mr. Harkless's complaints related to enlarged tonsils and found no evidence of any complications resulting from his tonsils, specifically noting in his records the absence of any swelling or bleeding in his mouth caused by his tonsils.

As indicated through Mr. Harkless's medical records, the medical staff at Easterling responded to each request for treatment or evaluation [on] each occasion when [Harkless] raised any concerns regarding his back, sinuses or other medical concerns. We conducted testing and referred Mr. Harkless to an off-site [ENT] specialist for further evaluation of his concerns and complaints [related to his sinus issues]. . . . [In my professional opinion], I, along with the medical staff at Easterling, provided Mr. Harkless with appropriate evaluations of and treatment for his complaints of back pain and sinus problems. I do not believe that an MRI is indicated or warranted given the information obtained through x-rays and physical examinations of Mr. Harkless. Moreover, the ENT specialist who evaluated Mr. Harkless clearly indicated to us that no further specialty treatment of any kind was warranted [for his sinus condition which Harkless believed occurred, in part, due to his use of the CPAP machine].

With respect to Mr. Harkless's complaints related to distilled water and a "medical hold," I frankly do not understand these allegations. Mr. Harkless did not require distilled water for his C-Pap machine nor were any orders ever entered requiring anyone to provide Mr. Harkless with distilled water for his C-Pap machine. With respect to the "medical hold" allegation, I have not entered any orders related to Mr. Harkless's custody or classification [as these] matters are primarily controlled and decided by the ADOC. . . . [H]ousing decisions are matters relegated to the ADOC. It is worth noting that the medical staff at Childersburg Correctional Work Center [previously] noted that Mr. Harkless had refused to accept any work assignments and was deemed no longer suitable for assignment to a work center. . . .

The ENT specialist who evaluated Mr. Harkless's sinus condition did not find that Mr. Harkless required surgery. . . . Mr. Harkless's allegation that he requires surgery on his tonsils is unwarranted and is not reflected in any of his medical records.

Throughout his incarceration [at Easterling], the medical staff also provided Mr. Harkless with treatment for his various chronic conditions including hypertension, alcohol dependence, sleep apnea and spinal pain. Due to Mr. Harkless's chronic hypertension and hyperlipidemia, he was enrolled

in the chronic care program within the ADOC medical system upon his incarceration.  Mr. Harkless has been regularly evaluated through the quarterly chronic care clinics held at the various correctional facilities where he has been incarcerated.

As indicated in Mr. Harkless's medical records, he has indicated routine and consistent noncompliance with medications when he was required to attend pill call.  In order to improve Mr. Harkless's compliance with these medications, we have allowed him to enroll in the Keep on Person program which allows him to maintain medication on his person instead of being required to report to pill call to receive medications.

During Mr. Harkless's incarceration at Easterling, I did not at any time ignore any of his requests for medical treatment.  I did not deliberately ignore any of his medical complaints or interfere in any way with the provision of medical care to him at any time. . . .

*Defendants' Exhibit 1 (Aff. of Dr. Jean Darbouze) - Doc. No. 38-1* at 2-13 (citations to

medical records omitted).

In her affidavit, Kristy Jolly addresses the allegations made by Harkless regarding an

examination she conducted on March 19, 2011.

As indicated in Mr. Harkless's medical records, he submitted a sick call request form dated March 19, 2011, complaining of neck discomfort.  Upon receiving this sick call request form, I summoned Mr. Harkless to the Health Care Unit on March 19, 2011, at approximately 5:40 p.m. during the course of sick call for evaluation of his complaints of neck pain.  I completed the sick call Nursing Protocol foom for "Musculoskeletal" problems at that time throughout the course of my evaluation of and interaction with Mr. Harkless.  As indicated in the Nursing Protocol form, I took Mr. Harkless's vital signs, and then documented the information he provided to me regarding his neck complaints, including complaints of "stiffness to neck," the absence of any "weakness," "numbness" or "swelling," and his statement that "Analgesic balm" had previously resolved his complaints of neck pain.  I discussed briefly with Mr. Harkless the things which caused pain to his neck and his need to avoid any strenuous activity until the stiffness of his neck dissipated.  I also told Mr. Harkless that he should notify the medical staff if his symptoms worsened prior to the next scheduled evaluation.  At the end of this interaction,

I offered Mr. Harkless Tylenol for his complaints, but he refused [this medication]. . . .   I [then] informed him that he would be attending an appointment with Dr. Darbouze on March 29, 2011, as I recorded in the Nursing Protocol form.

After my interaction with Mr. Harkless on March 19, 2011, he did not notify me that his complaints of neck stiffness changed in any way.  On March 26, 2011, he submitted another sick call form, but he did not mention anything regarding any problems with or discomfort in his neck.  At that time, Mr. Harkless was notified of his pending appointment on March 29, 2011, and [he] elected to forego an evaluation at sick call because of the pending appointment with Dr. Darbouze. . . .

Mr. Harkless attended the appointment with Dr. Darbouze on March 29, 2011.  Mr. Harkless did not mention anything regarding his complaints of neck pain during the course of this March 29, 2011, appointment. . . .

During my limited involvement in the provision of medical care to Mr. Harkless, I did not deliberately ignore any of his medical complaints or interfere  in any way with the provision of medical care to him at any time. . . .  I made every effort to ensure that I provided him with the necessary and appropriate medical treatment based upon his complaints.

*Defendants' Exhibit 3 (Aff. of Kristy Jolly) - Doc. No. 28-6* at 2-3.

The affidavit filed by Kay Wilson describes her interaction with Harkless regarding treatment relevant to the issues presented in the instant complaint as follows:

. . . While I am generally familiar with Mr. Harkless, I have not at any time provided him with any type of medical treatment of any kind or received any requests from him for any specific type of medical treatment.  In my role as the Health Services Administrator [at Easterling], I am rarely involved in direct clinical contact with patients who are seen during sick call, pill call or physician appointments.  I was not involved in any of these interactions between the medical staff at Easterling and Mr. Harkless.  Though Mr. Hakless has . . . included me as a defendant in this case, I was not involved in any of the decisions related to any of the medical treatment he sought or received during his incarceration at Easterling. . . .  [M]y only involvement with Mr. Harkless during his incarceration at Eastlerling entailed the written responses to the written grievances he submitted while incarcerated here.  I did not refuse to provide Mr. Harkless with any medical treatment of any kind during his

incarceration at Easterling.  Moreover, I was not aware of any circumstances where Mr. Harkless experienced a medical condition requiring medical treatment for which he did not receive a timely evaluation and treatment.

* * *

Throughout his incarceration at Easterling, Mr. Harkless has utilized the grievance process and raised various concerns with me.  On May 11, 2010, Mr. Harkless submitted a Medical Grievance raising several complaints related to his medical care, including that he had not been referred for an MRI of his back [and the need for an eye exam].  As indicated in the response, the medical staff brought Mr. Harkless to the Health Care Unit to discuss his concerns.  After this discussion, Mr. Harkless was referred to the site eye doctor for evaluation and was referred to Dr. Darbouze for evaluation of his other concerns, including his request for an MRI.

. . . As indicated in the Inmate Request Slip dated August 11, 2010, Mr. Harkless continued to voice concerns related to his need for "glasses," though a prior exam had revealed that he did not require any corrective glasses. . . .

* * *

Mr. Harkless . . . submitted a Medical Grievance form dated September 17, 2010, in which he voiced complaints related to his C-Pap machine.  In particular, Mr. Harkless [alleged he] had experienced certain issues related to his C-Pap machine, which were potentially contributing to his on-going sinus problems.  Mr. Harkless specifically requested that we provide him with "distilled water" for his C-Pap machine.  Upon receiving this Medical Grievance, I contacted another member of the medical staff ("Ms. Johnson") who informed me that the problems with Mr. Harkless's C-Pap machine related to an improper facemask and [that] . . . a "full face" C-Pap mask for Mr. Harkless's use [had been ordered].  Since September 17, 2010, Mr. Harkless has not raised any other concerns with me regarding his C-Pap machine or his alleged need for any "distilled water."

In a medical grievance dated October 8, 2010, Mr. Harkless requested the opportunity to see an Ear, Nose & Throat ("ENT") specialist.  However, as indicated in the [grievance] response dated October 12, 2010, I informed Mr. Harkless that the documentation related to his appointment with an off-site ENT specialist was pending at that time and that "an appointment will be made."  Pursuant to long-standing ADOC security protocols, the members of the Easterling medical staff are not permitted to notify inmates of the date, time or location of any off-site specialty consultations or appointments.

Mr. Harkless filed another Medical Grievance dated December 2, 2010,

requesting an MRI of his lower back.  In response to this Medical Grievance, I informed Mr. Harkless in my response on that same date that only the site physician could approve an MRI and that he should submit a sick call request form if he wished to discuss this request with the site physician.  Mr. Harkless filed nearly identical Medical Grievances on January 18, 2011, and February 18, 2011, raising the same issues regarding his request for an MRI and I provided the same response . . . originally included in my response to his December 2, 2010, Medical Grievance.

On May 5, 2011, Mr. Harkless submitted a grievance in which he checked both the Medical Grievance and Medical Grievance Appeal box[es].  However, upon reviewing this document, I noted that Mr. Harkless circled the section related to Medical Grievance indicating his intent to file a Medical Grievance, not a Medical Grievance Appeal.  I also noted that this Medical Grievance raised at least two "new" requests, including a request for a "second opinion" from another off-site ENT specialist and for an MRI of his neck *as well as his lower back*.  Upon receiving this Medical Grievance, I confirmed that the medical staff had implemented the recommendations provided by the off-site ENT specialist regarding Mr. Harkless and then re-iterated my previous response related to his request for an MRI.

As a registered nurse, I am not authorized to enter orders for Mr. Harkless to see any off-site specialist or to undergo any diagnostic imaging studies, [as these] are matters left to the judgment of the site physician.  During my involvement in the medical care provided to Mr. Harkless, I did not deliberately ignore any of his medical complaints or interfere in any way with the provision  of medical care to him at any time. . . .   I am not aware of any medical treatment of any kind which Mr. Harkless required which he did not receive during his incarceration at Easterling.

*Defendants' Exhibit 2 (Aff. of Kay Wilson) - Doc. No. 28-2* at 1-2, 5-8 (citations to medical

records omitted) (emphasis in original).

It is clear from the evidentiary materials submitted by the defendants that medical

personnel performed routine physical examinations of Harkless regarding his complaints of

pain in his back/neck and ordered x-rays to aid in their assessment of his condition.  Based

on these examinations and the findings from the x-rays set forth by the radiologists, medical

personnel determined that the pain about which Harkless complained emanated from minor

degenerative joint disease and "non-acute arthritic conditions which were likely the result of

his prior back condition [and] his overall physical condition and age. . . .  Mr. Harkless's

complaints of back pain [were] muscular in origin and . . . no further diagnostic testing was

necessary without some indication of some significant deformity or other underlying back

condition" neither of which appeared in the findings of the x-rays.  *Defendants' Exhibit 1*

*(Aff. of Dr. Jean Darbouze) - Doc. No. 38-1* at 6-7.  In addition to the numerous physical

examinations, routine evaluations and radiological tests performed on Harkless, the medical

records further establish that during his confinement at Easterling correctional physicians

continuously prescribed various medications, including Naproxen (a nonsteroidal anti-

inflammatory and pain reliever), Prednisone (a steroidal anti-inflammatory), Mobic (a

nonsteroidal anti-inflammatory) and Baclofen (a muscle relaxer), in an effort to alleviate the

back/neck pain about which Harkless complained.

  Under the circumstances of this case, the court concludes that the course of treatment

undertaken by the medical defendants in addressing Harkless' complaints of back pain and

lack of distilled water did not violate his constitutional rights.  The medical care Harkless

received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the

conscience or to be intolerable to the fundamental fairness."  *Harris*, 941 F.2d at 1505.  The

allegations presented by Harkless simply fail to establish deliberate indifference by the

medical defendants.  *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in

which condition should be treated fails to demonstrate a constitutional violation).  As is the issue here, whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability.  *Adams*, 61 F.3d at 1545-46.  In addition, an inmate's allegation that his prison physician did not diligently pursue alternative means of treating his condition "did not 'rise beyond negligence' . . . to the level of deliberate indifference."  *Id*.; *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Harkless received medical care for his back/neck pain and water for use in his CPAP machine.  It is likewise evident that the defendants rendered treatment to Harkless in accordance with their professional judgment.  Harkless simply disagrees with the course of treatment chosen by the defendants.  In addition, Harkless has failed to present any evidence which indicates that the defendants knew that the manner in which they provided treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing that the defendants acted with deliberate indifference to Harkless's medical needs.  Consequently, the court concludes that summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350; *Holifield*, 115 F.3d at

1564 n.6;  *Harris*, 65 F.3d at 916.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED;

2.  Judgment be GRANTED in favor of the defendants;

3.  This case be DISMISSED with prejudice; and

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that the parties are DIRECTED to file any objections to the Recommendation **on or before July 26, 2013**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33

(11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en

banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed

down prior to the close of business on September 30, 1981).

      Done this 12th day of July, 2013.


                  /s/ Wallace Capel, Jr.
                  WALLACE CAPEL, JR.
                  UNITED STATES MAGISTRATE JUDGE